IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

AHMED HASSAN NEJAT )
)
v. )        No. 3:03-0742
)
MICHAEL J. ASTRUE, )
Commissioner of Social Security[1] )

To:     The Honorable John T. Nixon, Senior District Judge


**REPORT AND RECOMMENDATION**

The plaintiff filed this action pursuant to 42 U.S.C. § 405(g) to obtain judicial review of the final decision of the Commissioner of the Social Security Administration denying the plaintiff's application for Supplemental Security Income ("SSI"), as provided by the Social Security Act ("the Act").

Upon review of the Administrative Record as a whole, the Court finds that the Commissioner's determination at step five of the sequential analysis that the plaintiff is able to perform work that exists in the national economy is supported by substantial evidence in the record as required by 42 U.S.C. § 405(g).

---

[1]Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Michael J. Astrue is automatically substituted for his predecessor, Jo Anne Barnhart.

1

# I. INTRODUCTION

The plaintiff filed his first application for SSI in 1996. (Tr. 36, 189, 221-25.) This claim was denied on February 14, 1997. (Tr. 195-99.) The record does not contain a request for reconsideration of this denial. The plaintiff filed a second application on July 17, 1997, alleging disability due to "[m]ultiple gunshot wounds to arms, legs, and chest, nervous condition, depression, and fatigue." (Tr. 226-38, and 389.) That claim was denied on August 18, 1997. (Tr. 200-03.) Upon reconsideration, the plaintiff's claim was denied by letter dated October 24, 1997. (Tr. 206-07.)

A hearing was conducted on September 9, 1998, before an Administrative Law Judge ("ALJ"), and the plaintiff testified through an interpreter and was "represented" by a friend, not an attorney. (Tr. 73.) On December 28, 1998, the ALJ found that the plaintiff was not disabled within the meaning of the Act. (Tr. 70-85.) The plaintiff sought review by the Appeals Council on February 9, 1999, and, on August 2, 2001, the Appeals Council vacated the ALJ's decision, and remanded the case because the record was incomplete.[2] (Tr. 88-91.)

A different ALJ conducted a second hearing on November 21, 2002. (Tr. 31-69.) The ALJ issued an unfavorable decision dated March 13, 2003. (Tr. 12-21.) The decision of the

---

[2]The hearing tape could not be located.

ALJ became the final decision of the Commissioner when the Appeals Council denied the plaintiff's request for review on June 13, 2003. (Tr. 7-8.)

The plaintiff now requests judicial review of the Commissioner's final decision pursuant to 42 U.S.C. § 405(g). Before the Court is the plaintiff's motion for judgment on the administrative record (Docket Entry No. 16), to which the defendant has responded (Docket Entry No. 22), and the plaintiff has replied (Docket Entry No. 27).

## II. BACKGROUND

Ahmad Hassan Nejat was born on February 15, 1954. (Tr. 226.) He was 43 years old at the time of his current application for SSI benefits. *Id.* He was 49 years old at the time of the ALJ's decision on March 13, 2003.

The plaintiff is a Kurdish immigrant from Iran. (Tr. 39.) He is literate in Kurdish, but he has a limited ability to read, write, or speak English. (Tr. 166, 376-77, 381, 15.) The plaintiff worked as a farmer in Kurdistan. (Tr. 376.) The plaintiff became a freedom fighter when the Iraqis, led by Saddam Hussain, invaded Kurdistan in the 1980s. He sustained multiple injuries, mostly from gunshot wounds. His home was destroyed, many of his friends were killed, and he and his family fled to Turkey before immigrating to this country. (Tr. 151, 376, 390.) He arrived in the United States on or about November 23, 1996. (Tr. 221.)

3

### A. Chronological Background: Procedural Developments and Medical Records

The plaintiff filed a claim for SSI on December 23, 1996. (Tr. 221-25.) The plaintiff was examined by Drs. Doineau and Campbell upon referral from Tennessee Disability Determination Services "based on allegations of multi gunshot wounds, arms, legs, chest, steel rod, etc." (Tr. 376.) Deborah Doineau, Ed.D., a licensed psychologist, performed a psychological consultative exam on January 30, 1997. (Tr. 376-79.) Because the plaintiff spoke no English, an interpreter assisted in the evaluation.[3] (Tr. 376.) Dr. Doineau observed that the plaintiff, although clean, appropriate, and talkative, appeared to be "much older than his stated age." *Id.* Although the plaintiff provided no documentation to substantiate allegations of disability, Dr. Doineau expressed her belief that "information provided by the [plaintiff] through [the interpreter] was accurate." *Id.*

Dr. Doineau summarized the plaintiff's life in Kurdistan. The plaintiff had nine siblings and lost his father at the age of two. (Tr. 377.) He received no formal education, but taught himself to read in Kurdish as an adult. *Id.* He was a prosperous farmer with no history of physical or mental problems prior to the invasion of Iran by the Iraqis in the 1980s. (Tr. 376-77.) The plaintiff became a relatively prominent figure in the rebellion. (Tr. 377.) The plaintiff's war injuries occurred between 1982 and 1987 and resulted in limited use of his arms, hands, and legs. The plaintiff's home was destroyed and many of

---

[3]The quality and accuracy of the various assessments contained in the record appear to be commensurate with the presence or absence and relative ability of an interpreter.

Case 3:03-cv-00742   Document 34   Filed 09/25/08   Page 4 of 55 PageID #: 27

his friends and relatives were killed. He and his family were forced to flee to Turkey, and were eventually allowed to emigrate to the United States. The plaintiff has never taken medication for mental health issues or received psychiatric treatment. *Id.*

The plaintiff reported feeling "sad and down" "off and on," and "somewhat lost and useless living in the United States." *Id.* He said that he had trouble sleeping, decreased energy, was irritable, and was worried about his country and friends, but he denied symptoms associated with post-traumatic stress disorder. (Tr. 377-78.) Dr. Doineau described the plaintiff as spending most of his time sitting and reading, although she noted that he made decisions, managed his life, shopped, cooked, and cared for his spouse, who suffers from serious depression. (Tr. 378.)

Dr. Doineau administered the Raven Progressive Matrices to determine the plaintiff's level of intellectual functioning. The plaintiff did not respond consistently to the five sets of questions, and Dr. Doineau ultimately concluded that the plaintiff's actual results were not indicative of his abilities, and that he functions well above the mental retardation range, despite the fact that a literal interpretation of his test results might have indicated otherwise.[4] The Rorschach Projective test revealed "mild anxiety," and "underlying hostility," but no evidence of a psychotic condition or severe depression.

---

[4]In reaching that determination, Dr. Doineau relied upon the plaintiff's history, the fact that he taught himself to read as an adult, sophisticated responses to the Rorschach test, and the interpreter's descriptions of the plaintiff's ability to express himself in his native language. (Tr. 378.)

5

Dr. Doineau concluded that the plaintiff was capable of interacting appropriately with others. *Id.* Although capable of understanding instructions, remembering and persisting, the plaintiff was assessed to have a mild impairment in his ability to concentrate. (Tr. 379.) Dr. Doineau's ultimate impressions were of late onset dysthymic disorder (a form of depression) and multiple wounds associated with physical limitations. *Id.*

Dr. Earl Campbell performed a consultative examination on February 4, 1997. (Tr. 374.) Although the plaintiff was accompanied by an interpreter, Dr. Campbell found it difficult to obtain a medical history from the plaintiff, and impossible to perform certain tests, including the visual acuity test.[5] (Tr. 374-75.) Dr. Campbell noted the plaintiff's history of gunshot wounds to his right arm, left arm, left leg, chest, and head, in 1984, 1986, and 1987. (Tr. 374.) The plaintiff reported that he was only able to lift objects of three to four pounds with his right hand, and that he had surgery on his left thigh and leg in 1986. *Id.* Dr. Campbell observed various scars on the plaintiff's forearm, left thigh, right calf, and left lateral ankle. (Tr. 375.) Dr. Campbell assessed that the plaintiff could occasionally lift and/or pull up to forty pounds for at least one- to two-thirds of an eight-hour day, and frequently lift/pull a maximum of thirty pounds. *Id.* Dr. Campbell assessed that the plaintiff could stand, walk, and/or sit with normal breaks for at least six hours. *Id.*

---

[5]The Snellen chart, the most common device used to test visual acuity, relies upon the patient's ability to read the English alphabet.

6

In early 1997, the plaintiff obtained a job working at Opryland doing banquet set-up. (Tr. 398.)  On May 14, 1997, the plaintiff injured his wrist on the job.   The plaintiff was initially treated at Baptist Central Care, given a splint, and allowed modified work duties.

Dr. Stanley Hopp began treating the plaintiff for his work-related injury on May 22, 1997.  Dr. Hopp noted the plaintiff's history of gunshot wound and the presence of a metal plate in the plaintiff's wrist as well as deformity of the wrist.  Although the plaintiff had "fairly good" range of motion and sensation, there was mild tenderness.  Dr. Hopp concluded that the plaintiff had a contusion and strain of the right wrist.  *Id.*  He ordered limited use of the right hand for two weeks with use of the splint, returning as needed. (Tr. 398-99.)  Dr. Hopp concluded that there was no impairment from the recent injury. (Tr. 399.)

On June 26, 1997, the plaintiff returned to Dr. Hopp, complaining that his right wrist "was worse."  (Tr. 395.)  The plaintiff said that he could not work, needed to rest, and complained of pain in his left wrist, apparently brought on by having to favor the right wrist.  Dr. Hopp said that he suspected symptom magnification, and he attributed the plaintiff's pain to his deformed wrist, arthritis, and heavy exertion.  He released the plaintiff to work.  *Id.*

On July 3, 1997, the plaintiff began seeing Dr. John McInnis, an orthopedic surgeon. (Tr. 381.)   The plaintiff communicated with Dr. McInnis through an interpreter.

7

Dr. McInnis summarized the plaintiff's injury and subsequent treatment by Dr. Hopp, and stated that the plaintiff continued to experience pain and weakness in right hand and wrist, with occasional radiation into his right shoulder. Dr. McInnis noted deformity of the right hand and wrist, loss of motion of the right wrist, decreased grip strength of the right hand, negative Tinel's sign and negative Phalen's test. The plaintiff exhibited a full range of motion of his right elbow and shoulder, no positive impingement sign and a negative two finger test of the right shoulder. X-rays revealed previous fractures of the wrist and fingers, a metal plate and screws, various deformities, and marked narrowing of the radial carpal articulation. Dr. McInnis noted "significant degenerative arthritis of [the] right wrist," and that any restrictions imposed would be due to the plaintiff's pre-existing injuries, and not the relatively minor injury incurred at Opryland. *Id.* Although he concluded that there should be no long-term physical impairment resulting from the Opryland injury, Dr. McInnis did restrict the plaintiff to lifting less than ten pounds with his right arm/hand. (Tr. 381, 388.)

On October 1, 1997, the plaintiff underwent another psychological evaluation with Dr. Doineau. (Tr. 389.) A translator again assisted during the examination, although Dr. Doineau noted that the interpreter's English was only "fair," and that some information might not have been conveyed "which might have been helpful in better understanding [the plaintiff's] condition." *Id.* Dr. Doineau's report significantly mirrors her previous

8

evaluation, with a few additional facts. First, she noted that the plaintiff's wife receives disability benefits based on severe depression. She also pointed out that the couple has three children in the United States, the youngest being fourteen at the time of the examination and living with his parents. (Tr. 390.) The plaintiff and his family were living with friends, but the plaintiff disliked being dependent on others and living in someone else's house. (Tr. 390-91.) The plaintiff described "occasional bad memories of the atrocities he witnessed during the rebellion." (Tr. 391.) However, he said he felt better when with friends or socializing, and seemed to believe that he would feel less depressed if he were able to work and be productive. *Id.*

In this assessment, Dr. Doineau noted a *moderate* impairment in the plaintiff's ability to concentrate and persist, as compared to the mild impairment in ability to concentrate only, as noted in the January assessment. (Tr. 392.) She additionally noted symptoms of Post Traumatic Stress Disorder ("PTSD"). *Id.*

On October 20, 1997, Dr. George W. Bounds, a non-examining DDS consultant, completed an RFC Assessment form. (Tr. 369.) Relying upon the previous assessments by Drs. Hopp and Campbell, Dr. Bounds found that the plaintiff could lift/carry up to twenty pounds occasionally and up to ten pounds frequently. (Tr. 363-64.) He opined that the plaintiff could stand and/or walk for about six hours in an eight hour workday, and sit for the same period. Pushing/pulling was unlimited. *Id.*

9

The plaintiff saw Dr. Robert Francis on July 28, 1998. (Tr. 145.) Dr. Francis noted the plaintiff's previous injuries and resulting deformities, as well as some arthritic changes in the fingers and wrist of the right hand, but he found no indication of active infection in the bone. Other medical records included in the administrative record indicate that Dr. Francis and other doctors at the Family Health Care Group treated the plaintiff between the 1998 visit through December 13, 2001, although some of these records are either undated, difficult to read, or both. (Tr. 135-45.)

On November 30, 1998, the plaintiff presented to Vanderbilt Medical Center following a car accident. (Tr. 102-15.) The plaintiff complained of pain in the right-side of his neck, shoulder, upper extremity, forearm, right chest wall, and side. (Tr. 109.) X-rays of the plaintiff revealed no new injuries from the car accident, but did show the plaintiff's old injuries and fractures, as well as "extensive dystrophic calcification" of the right wrist. (Tr. 103.) The plaintiff was diagnosed with a musculoskeletal strain, instructed to take Motrin and hydrocodone for pain, and follow up as needed. (Tr. 112.)

In a decision issued December 28, 1998, the ALJ found the plaintiff not disabled within the meaning of the Act. (Tr. 70-85.) On February 2, 1999, the plaintiff requested review of the December 28, 1998, decision. (Tr. 88.)

On April 27, 1999, Dr. William Bacon completed a statement noting that the plaintiff has a severe deformity of the right wrist with early arthritis and a retained plate and

10

screws. (Tr. 116.) He also noted that poor healing of the left humerus fractured by a gunshot wound has caused cubitus varus, or inward angulation of the elbow. *Id.*

On July 21, 2000, the plaintiff presented to Dr. Plummer following a second motor vehicle accident. (Tr. 123.) The plaintiff was rear-ended, slammed against the steering wheel, and he complained of neck pain and mild chest tenderness. Dr. Plummer diagnosed an acute cervical strain, and discharged the plaintiff with prescriptions for pain, directions to use ice for forty-eight hours, and instructions not to lift or strain for three to five days. The plaintiff was excused from work July 21 through July 23.[6] *Id.* On July 25, 2000, the plaintiff returned to the doctor complaining of persistent neck pain. (Tr. 119.) Dr. Brunetto noted discomfort at C5 and muscle spasm of the trapezius muscles bilaterally, and prescribed Darvocet for pain. *Id.*

Dr. Said Attoussi saw the plaintiff on November 28, 2001, for right hand and right wrist pain. (Tr. 134.) Dr. Attoussi noted the old injuries, but found no evidence of rheumatoid arthritis or definite evidence of acute osteomyelitis (infection of bone). Dr. Attoussi recorded degenerative changes at the radial carpal articulations. *Id.* The plaintiff returned on December 14 and 26, 2001, complaining of severe arthritis and pain. (Tr. 129, 130.) The doctor's diagnoses and proposed treatments are largely illegible,

---

[6]It is not clear whether the plaintiff was actually employed at this time, or if Dr. Plummer erroneously assumed that he was. *See* the plaintiff's testimony on November 21, 2002, that he had not been employed since he worked at Opryland in 1997. (Tr. 46.)

11

although on December 14, 2001, Dr. Attoussi noted "new onset HTN," the medical abbreviation for hypertension (high blood pressure).[7] (Tr. 129.)

On January 20, 2002, Dr. Attoussi completed a Medical Source Statement. (Tr. 147-150.) Dr. Attoussi indicated that the plaintiff could lift and/or carry up to twenty pounds frequently and the same amount occasionally. Dr. Attoussi indicated that the plaintiff could stand and/or walk at least two hours of an eight hour workday, and that sitting was not affected. Pushing and/or pulling were limited in the upper extremities. Dr. Attoussi indicated that the plaintiff had several gunshot wounds and injuries to his arm, knee and upper chest. Dr. Attoussi indicated that the plaintiff could occasionally climb, balance, kneel, crouch, and crawl, and frequently stoop. Reaching was limited, but handling, fingering, and feeling were not. Seeing, hearing and speaking were unlimited, although there was no mention of the plaintiff's inability to speak English. Dr. Attoussi indicated environmental limitations of vibration and hazards such as machinery, explaining that "[v]ibration and machinery may increase perception of pain and discomfort." *Id.*

_____

[7]In further support of the plaintiff's hypertensive condition, on December 11, 2001, Dr. Carlson at the American Red Cross issued a deferral letter to the plaintiff informing him that they were unable to accept his blood donation due to high blood pressure. (Tr. 173.) The plaintiff's diastolic pressure was 110 and 112 in the left and right arms, respectively, and the Red Cross requires that these levels register no higher than 100. *Id.* This supports Dr. Attoussi's nearly contemporaneous note of December 14, noting hypertension. (Tr. 129.)

The plaintiff was treated by Dr. Attoussi between January 16, 2002, and September 18, 2002. (Tr. 174-88.) Dr. Attoussi continued to note arthritis and hypertension, as well as hyperlipidemia. (Tr. 177, 178.) On February 20, 2002, Dr. Attoussi notes "HTN controlled," and records a blood pressure of 120/85, which is within normal limits. (Tr. 176.)

The plaintiff was examined by Dr. Scott Dube, an orthopedist, on March 17, 2002. (Tr. 151.) An interpreter was present. Dr. Dube meticulously recorded the plaintiff's history of gunshot wounds,[8] depression, and hypertension, and stated that the plaintiff reported physical and mental difficulties as a result of his injuries and was seeing a psychiatrist.[9] The plaintiff reported that his medications included Atenolol, Celebrex, Naprosyn and Prilosec. The plaintiff reported that he could walk thirty or forty minutes without having to sit down and stand ninety minutes. *Id.* In light of the plaintiff's injuries and resulting limitations, Dr. Dube recommended that the plaintiff avoid lifting over twenty pounds with the right wrist or jobs with frequent repetitive activity. (Tr. 153.) He

---

[8]Dr. Dube provided a detailed description of the sites of previous gunshot wounds and resulting deformity or limitation: right calf, left thigh, left elbow (partial 20 degree valgus deformity of left elbow), left ankle, and right wrist (valgus deformity of right wrist, limited right wrist flexion and 10 degrees of radial deviation). (Tr. 152.)

[9]It is not clear whether the plaintiff was actually seeing a psychiatrist at that time or not. All of the other references to his mental health treatment contained in the record, including the plaintiff's own hearing testimony, indicate that the plaintiff had never undergone any kind of mental health treatment.

13

further recommended a psychiatric evaluation in light of the plaintiff's history of depression. *Id.*

On March 18, 2002, Dr. Dube filled out a medical source statement. (Tr. 155-58.) He indicated that lifting/carrying were affected and that the plaintiff could frequently lift/carry a maximum of twenty pounds. (Tr. 155.) Dr. Dube indicated that standing/walking and sitting were not affected. (Tr. 155-56.) Dr. Dube limited pushing and pulling in the right side upper extremities. (Tr. 156.) Climbing, crouching, crawling, and stooping were limited to occasionally, while balancing and kneeling could be performed frequently. *Id.* There were no manipulative, visual/communicative, or environmental limitations noted. (Tr. 157-58.)

Dr. Bruce Davis conducted a consultative exam for the State of Tennessee on June 10, 2002. (Tr. 159-65.) The plaintiff was assisted by a relative, acting as an interpreter. (Tr. 159.) Dr. Davis noted a history of right upper chest injury, "right forearm injury/surgery with pain, stiffness, and weakness," a left elbow injury with stiffness and weakness, a left thigh injury, and injuries to both ankles with pain and stiffness. *Id.* Treatments included heat, medication and physician visits "without use of crutches, cane, walker, or brace." *Id.* Dr. Davis documented a five-year history of high blood pressure and treatment without heart or blood vessel damage. Dr. Davis recorded that the plaintiff had

14

poor vision,[10] documented an old motor vehicle accident neck injury, and situational anxiety/depression. *Id.* Dr. Davis reported that the plaintiff has a ninth grade education, although this appears to be the only such indicator of any formal education contained in the administrative record. (Tr. 160.) Dr. Davis noted forearm tenderness, reduced flexion/extension, slightly reduced grip strength, incomplete elbow extension, reduced ankle motion, normal gait with mild tandem unsteadiness. *Id.* The plaintiff was alert and oriented, but "depressed." *Id.* Diagnoses included class 1 obesity, musculoskeletal disease due to gunshot wound injuries, situational depression and hypertension. (Tr. 161.) These medical conditions were termed "chronic" and "not improved with treatment," warranting regular medical maintenance care. *Id.* Dr. Davis limited the plaintiff to occasionally lifting up to twenty pounds and frequently lifting up to ten pounds. *Id.* Standing/walking was limited to up to six hours in an eight hour day with less than one hour uninterrupted, and sitting was unrestricted. Other physical/environmental limitations included limited heat/humidity, climbing/heights, and forceful grip. *Id.*

Dr. Davis also completed a medical source statement. (Tr. 162-65.) The medical source statement provides essentially the same information detailed above, provided in the typewritten examination notes. However, on the medical source statement, Dr. Davis

---

[10]Results of an eye exam given using the standard Snellen chart were inconsistent, an anomaly which is more likely attributable to the plaintiff's inability to recognize and identify the English alphabet than any diagnosable medical condition.

15

indicated that the plaintiff was limited in standing and walking to at least *two* hours in an eight hour workday with less than one hour uninterrupted, as opposed to the *six* hours indicated on the typed report. (Tr. 162.) The medical statement additionally limited pushing and pulling in both upper and lower extremities, and limited climbing, balancing, kneeling, crouching, and stooping occasionally. Crawling was ruled out altogether. (Tr. 163.) Fingering (fine manipulation) was limited to occasionally. (Tr. 164.) No environmental limitations were provided. (Tr. 165.)

On July 1, 2002, Dr. Kathryn B. Sherrod, a licensed clinical psychologist, performed a clinical interview with a nonverbal intellectual assessment and projective testing. (Tr. 166-72.) Her report, dated July 3, 2002, is thorough. The plaintiff was accompanied by an interpreter. (Tr. 166.) Dr. Sherrod reported that the plaintiff does not understand or speak enough English to communicate effectively, and seemed confused about dates and details of some events. *Id.* The plaintiff reported chronic pain from his war injuries. The interpreter explained, "It's as if he's been shattered – he is in constant pain and he no longer has any physical stamina." *Id.* The plaintiff reported depression due to inability to work and "operate normally." *Id.* The plaintiff reported crying a lot, becoming easily upset, feeling anxious, and waking up afraid in the night. *Id.* He reported "flashbacks to battle," hearing mumbled voices and seeing dead people, including his friends who died in Kurdistan. (Tr. 167.) The plaintiff reported losing track of "things and time," viewing

16

himself as a "crippled man," and being upset by his loss of social position and respect. *Id.*
The plaintiff stated that his son helps him with dressing, bathing, and shaving, and this embarrassed him. He reported feeling useless, and wishing that he and his wife could work and lead a normal, productive life. *Id.*

The plaintiff reported that his daily activities included spending days at home or visiting relatives if they picked him up. He reported watching TV, and said that he does not help with household chores, and that his wife and son prepared meals. Dr. Sherrod noted that the plaintiff's failure to participate in domestic duties is partially due to cultural customs. (Tr. 168.) He reported trouble falling asleep, and "does not enjoy doing anything." (Tr. 167.)

Dr. Sherrod noted that the plaintiff appeared "withdrawn and depressed during his evaluation." (Tr. 168.) She noted poor concentration, and that the plaintiff appeared to be in pain. He had difficulty with the tests, but Dr. Sherrod attributed some of this difficulty to his lack of education and unfamiliarity with tests. She estimated that he is functioning at least in the borderline range of intelligence. *Id.*

Dr. Sherrod noted that the plaintiff's poor performance on the Bender-Gestalt test could be indicative of deficient performance and/or brain damage. However, she also noted that the errors may have been intentional. *Id.* A Rorschach test indicated that the plaintiff was anxious and depressed, with symptoms of PTSD from his experiences in the

17

revolution. (Tr. 169.) Dr. Sherrod also observed that the plaintiff "seemed worried, sad, and withdrawn."[11] *Id.*

Dr. Sherrod expressed skepticism about how the plaintiff could have once functioned as a leader but at the date of examination appear unable to complete even simple tasks. She speculated that PTSD or depression could be interfering with his abilities, or that he was simply not trying. *Id.* She opined that he could not manage American money. (Tr. 170.) Dr. Sherrod's diagnoses included chronic PTSD, late onset dysthemic disorder, borderline intellectual functioning, physical weakness, chronic pain, high blood pressure, psychosocial stressors, including unemployment, fighting in the Kurdish revolution, and a GAF of 51.[12] *Id.* Dr. Sherrod acknowledged that the plaintiff's lack of formal schooling may have impaired his ability to participate fully in the evaluation. She noted problems maintaining concentration and marked reactivity to stress. She found his adaptive skills to be limited. *Id.*

------

[11]For example, the plaintiff expressed that he wished that he were not disabled and could take care of himself and his family. (Tr. 169.) He was angry about the events of 9/11. He reported appreciating living in America, although he missed his home. He stated that death would provide a release from pain. *Id.*

[12]The DSM-IV defines a GAF of 51-60 as exhibiting "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." Diagnostic and Statistical Manual of Mental Disorders 34 (American Psychiatric Ass'n et al. eds., 4th ed. 2002).

18

Dr. Sherrod completed a medical source statement on July 5, 2002. (Tr. 171-72.) She indicated moderate impairment in understanding, remembering and carrying out short, simple instructions, marked impairment in understanding, remembering and carrying out detailed instructions, and moderate impairment in ability to make judgments on simple work-related decisions. (Tr. 171.) She noted that his IQ was in the retarded range, but explained that she did not believe he was actually retarded. *Id.* She opined that the plaintiff's ability to respond appropriately to supervisors, co-workers, and work pressures in a work setting are affected. (Tr. 172.) She noted a marked inability to interact appropriately with the public, moderate inability to interact appropriately with supervisors, slight impairment in interacting appropriately with co-workers, a marked impairment in responding appropriately to work pressures, and at least a slight impairment to responding appropriately to changes in a routine work setting (both slight and marked were checked for the last item). Dr. Sherrod noted that the plaintiff "becomes overwhelmed" when exposed to even minor stress. *Id.*

## B. Hearing Testimony: The Plaintiff and a Vocational Expert

A second hearing was held on November 21, 2002, before ALJ Robert C. Haynes. (Tr. 31-69.) The plaintiff was represented at the hearing by an attorney, and assisted by an interpreter. Lisa Courtney, vocational expert ("VE"), also testified. *Id.* The plaintiff

19

testified (through the interpreter) about his time as a freedom fighter and described his injuries. (Tr. 40.) His left leg and arm were injured, and he underwent surgery to his left leg. (Tr. 41.) The plaintiff testified that his leg injury still affects his ability to stand and walk, and also affects "the way [he is] thinking." (Tr. 41-42.) Thoughts about the war disrupted his sleep and mental well-being. *Id.* He believes that the Iraqis used chemical weapons, which caused him additional injuries. (Tr. 43.)

The plaintiff described working at Opryland in 1997. (Tr. 42.) He was allowed an hour break after each hour of work, but found it difficult to work even with that accommodation. He also described problems with concentrating and staying on task. The plaintiff testified that he worked for Opryland about three months, and has not been employed since then. (Tr. 46.) The plaintiff related being very demoralized by being unable to continue to work, and that he believed he was going to get worse, not better. *Id.*

The plaintiff stated that he had pain in his chest, both arms, both legs, and "almost [his] entire body" when he moved to do anything. He testified that prescription pain medication provided only temporary relief. The plaintiff testified that he experienced side effects, such as upset stomach and drowsiness, as a result of his pain medication. (Tr. 47.) He also testified that he has to lie down after taking his medication. *Id.* He reported being happiest at family gatherings, but he felt lonely and depressed when alone with his wife and son. *Id.* He estimated that he could walk about fifty feet before he felt pain in his "legs

20

and body." *Id.* He said that sitting for more than an hour causes pain. (Tr. 44.) The plaintiff estimated that he could lift "maybe four pounds, not more." The plaintiff described living with his wife and son, and helping a little around the house. *Id.* He related that he liked to visit relatives, but often could not stay for long visits because of his pain. (Tr. 45.)

A vocational expert also testified. (Tr. 49-68.) The VE was asked to assume a younger person of foreign extraction with no useful English capacity and no past relevant work. (Tr. 49-50.) The ALJ asked the VE to consider the March 2002 assessment of Dr. Davis at Exhibit 12F. (Tr. 50.) Exhibit 12F is actually an assessment by Dr. Dube, performed in March 2002. (Tr. 155-58.) Dr. Davis did perform a consultative examination, but his assessment is dated June 10, 2002. (Tr. 159-65.) The ALJ's description of the limitations match the limitations in Dr. Dube's report, so it appears that the ALJ merely confused the doctors' names.[13] The ALJ summarized Dr. Dube's report as containing a 20-pound limit on frequent lifting, with no standing, walking, or sitting limitations, some limits on pushing and pulling in the upper extremities, frequent balancing and kneeling, and occasionally climbing, crouching, crawling and stooping limitations. There were no manipulative, visual, communication, or environmental restrictions. (Tr. 50.) After

---

[13]Indeed, directly after discussing the assessment of Dr. Dube (incorrectly identified by the ALJ as an assessment by Dr. Davis), the ALJ addressed Dr. Davis's June 2002 assessment at Exhibit 13F, which is, in fact, Dr. Davis's assessment. (Tr. 51.)

ascertaining that the plaintiff is right-handed, the VE assessed that this report would direct a finding of a limited range of light work. (Tr. 51.)

The ALJ asked the VE to consider Dr. Davis's June 2002 assessment at Exhibit 13F. (Tr. 51, 159-65), in which he opined that the plaintiff could lift 20 pounds occasionally and ten pounds frequently, stand and walk at least two hours in an eight hour day, with less than one hour uninterrupted.[14] Dr. Davis did not limit sitting. Pushing and pulling were limited in both upper and lower extremities, and all postural limitations were limited to "occasionally" except crawling, which was totally ruled out. Fingering (fine manipulation) was limited to occasionally, and there were no environmental, visual, or communication restrictions. The VE assessed this report as describing a "somewhat more narrow range" of light work. *Id.*

The ALJ directed the VE's attention to the assessment from Dr. Attoussi at Exhibit 11F.[15] (Tr. 52.) That assessment included the following: lifting 20 pounds both frequently and occasionally, standing and walking two hours a day, no sitting limits, pushing/pulling

---

[14]As summarized above, Dr. Davis's records include a typed, outline-style summary of the physical examination of the plaintiff, as well as a medical source statement. In his typed summary, Dr. Davis indicated that the plaintiff could stand/walk up to six hours in an eight hour workday with less than one hour uninterrupted. (Tr. 161.) However, in the medical source statement, Dr. Davis checked the box next to "at least 2 hours in an 8-hour day," and added the notation "< 1 hour uninterrupted." (Tr. 162.)

[15]The transcript utilized a phonetic spelling, "Atussey," when referencing Dr. Attoussi.

limited in upper extremities, occasional postural activities except stooping (which may be performed frequently), reaching was limited, but handling, fingering, and feeling were not. No visual or communication limitations were noted, but there were environmental limitations including exposure to vibration and hazardous equipment. (Tr. 147-50.) The VE testified that this assessment basically described sedentary work, with maybe a few light jobs remaining. (Tr. 52.) The VE identified night patrol inspector and "assembly jobs" as jobs in the light category that could be performed by someone with these limitations, and estimated that there were "a couple of 1,000" such jobs in Tennessee. (Tr. 53-54.) However, after taking the language barrier into account, the VE removed the job of night patrol inspector and substituted hand packing jobs, at numbers of "roughly around 2,000."[16] (Tr. 54.)

The ALJ next asked the VE to consider the assessment of Dr. Campbell for "historical perspective." (Tr. 54-55.) Dr. Campbell examined the plaintiff in February 1997. (Tr. 374.) There was no interpreter present at this examination. The ALJ summarized Dr. Campbell's assessment for the VE as being able to occasionally (1/3 to 2/3 of an eight-hour day) lift/pull up to forty pounds, and up to thirty pounds frequently. (Tr. 55.) Dr. Campbell also opined that the plaintiff could stand, walk, and sit for at least six hours.

---

[16]The VE's testimony was confusing. It was not clear whether she meant that there were 800-900 night patrol inspector jobs in addition to 2,000 assembly jobs or 2,000 patrol inspector and assembly jobs. It was also not clear whether she meant that there were 2,000 hand packing jobs in addition to assembly jobs. *See also* Tr. 59-60.

The VE determined that this assessment would describe a full range of light work, and at least some medium jobs.  *Id.*

The ALJ asked the VE to consider the consultative examination performed by Dr. Sherrod in July 2002.  The ALJ pointed out the "marked limitations" described by Dr. Sherrod, and the VE opined that these limitations "would rule out all work."  (Tr. 56.) The VE additionally opined that pain rising to the moderately severe level for a sufficient period of time such that it interfered with a person's ability to sustain work-like functions would rule out all work.  (Tr. 58.)

The VE was asked a series of questions by both the ALJ and the plaintiff's attorney about the effect of an impairment affecting concentrating and persisting.  A moderate limitation in the ability to concentrate and persist, with no other limitations, would preclude 50% of the 1600 occupations "administratively noticed."[17]  (Tr. 60.)  The addition of a limitation on the ability to use the dominant upper extremity would cause the

---

[17]The plaintiff's attorney asked the VE about the "percentage of the 200 sedentary unskilled occupations and 1,400 unskilled light occupations which the Administration administratively notice[d]" that would be eliminated if the plaintiff had a moderate limitation in the ability to concentrate and persist.  (Tr. 60.)  After reviewing the entirety of the VE's previous testimony, the Court could not find a statement by the ALJ that the Administration was "administratively noticing" any number of occupations (save a reference to "noticed jobs" at Tr. 63 when the ALJ repeated a portion of the plaintiff's attorney's question), nor could the Court discover any specific instances in which the VE testified about 200 sedentary unskilled occupations and 1,400 unskilled light occupations. The VE eventually corrected the plaintiff's attorney and pointed out that "200 occupations" was not the same thing as "200 jobs," and that there were "numerous jobs within [the 200 occupations]."  (Tr. 63-64.)  Unfortunately, this correction did little to clarify her testimony.

24

reduction in occupational base to approach 85%, leaving a 15% base. (Tr. 60-61.) The limitation on fingering described in Dr. Davis's assessment, if accepted, would reduce the "200 administratively noticed sedentary occupations" by 85%. (Tr. 63.) The limitation on fingering would not similarly reduce the number of light jobs, since they generally require less fine motor fingering. (Tr. 66-67.) The VE agreed that the plaintiff's limitations in the assessments of both Dr. Attoussi and Dr. Davis "greatly erode[] both the sedentary and the light occupational base." (Tr. 65.) The VE also agreed that if the ALJ accepted the plaintiff's testimony that he must lie down after taking his pain medication, the plaintiff would be precluded from performing any work. *Id.*

## III. THE ALJ'S FINDINGS

Another unfavorable decision issued on March 13, 2003. (Tr. 12-21.) Based on the record, the ALJ made the following findings. (Tr. 20-21.)

1.     The claimant has not engaged in substantial gainful activity since his arrival in this country in 1996.

2.     The medical evidence establishes that the claimant has "severe" impairments, including arthritis involving the right wrist and shoulder and hypertension, but does not have an impairment or combination of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4.

3.     The subjective complaints are not persuasive, as explained above.

25

4. The claimant has the residual functional capacity to perform light work as described above.

5. The claimant has no past relevant work.

6. The claimant is 49 years old, which is defined as a younger individual.

7. The claimant has is [sic] literate in Kurdish but illiterate in English.

8. The claimant does not have any acquired work skills, which are transferable to the skilled or semiskilled work functions of other work.

9. Based on an exertional capacity for light work and the claimant's age, education, and work experience, section 416.969 of Regulations No. 16 and Rule 202.16, Table No. 2, of Appendix 2, Subpart P, Regulations No. 4 would direct a conclusion of "not disabled."

10. Although the claimant's additional non-exertional limitations may not allow him to perform the full range of light work, using the above-cited rule as a framework for decision-making and based on the vocational expert's testimony, there are a significant number of jobs in the national economy that he could perform. Examples and numbers of such jobs are cited above.

11. The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision.

## IV. DISCUSSION

### A. Standard of Review

The determination of disability under the Act is an administrative decision, and the only questions before this Court are whether the decision of the Commissioner is supported by substantial evidence and whether the Commissioner employed the proper legal standards in reaching his conclusion. 42 U.S.C. § 405(g). *See Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971) (adopting and defining substantial evidence standard in context of Social Security cases). The Commissioner's decision must be affirmed if it is supported by substantial evidence, even if the evidence could also support another conclusion. *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999). Substantial evidence is defined as "more than a mere scintilla" and "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L. Ed. 126 (1938)); *Le Master v. Weinberger*, 533 F.2d 337, 339 (6th Cir. 1976) (quoting Sixth Circuit opinions adopting language substantially similar to that in *Richardson*). A reviewing court may not try the case de novo, resolve conflicts in evidence, or decide questions of credibility. *See, e.g., Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984) (citing *Myers v. Richardson*, 471 F.2d 1265, 1268 (6th Cir. 1972)). The Court must accept the ALJ's explicit findings and determination unless the record as a whole is without substantial evidence

27

to support the ALJ's determination. 42 U.S.C. § 405(g). *See, e.g., Houston v. Sec'y of Health & Human Servs.*, 736 F.2d 365, 366 (6th Cir. 1984).

The Commissioner must employ a five-step evaluation process in determining the issue of disability. *See, e.g., Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). The original burden of establishing disability is on the plaintiff, and impairments must be demonstrated by medically acceptable clinical and laboratory diagnostic techniques. *See* 42 U.S.C. § 1382c(a)(3)(D); 20 C.F.R. §§ 404.1512(a), (c), 404.1513(d). First, the plaintiff must show that he is not engaged in "substantial gainful activity" at the time he seeks disability benefits. *Heston*, 245 F.3d at 534 (citing 20 C.F.R. §§ 404.1520(b) and 416.920(b)). A plaintiff who is performing substantial gainful activity is not disabled no matter how severe the plaintiff's medical condition may be. 20 C.F.R. § 416.920(a)(4)(I).

Second, the plaintiff must show that he suffers from a "severe impairment." A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities." *Heston*, 245 F.3d at 534 (citing 20 C.F.R. §§ 404.1520(c) and 416.920(c)). Basic work activities are "the abilities and aptitudes necessary to do most jobs," such as "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; [c]apacities for seeing, hearing, and speaking; [u]nderstanding, carrying out, and remembering simple instructions; [u]se of judgment; [r]esponding appropriately to supervision, co-workers and usual work situations; and [d]ealing with changes in a routine

28

work setting." § 404.1521(b). The Commissioner is required to consider the combined effects of impairments that individually are not severe but cumulatively may constitute a severe impairment. 42 U.S.C. § 423(d)(2)(B); *Foster v. Bowen*, 853 F.2d 483, 490 (6th Cir. 1988).

Third, if the plaintiff is not engaging in substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the plaintiff is presumed disabled without further inquiry, regardless of age, education or work experience. *Id.* (citing 20 C.F.R. §§ 404.1520(d) and 416.920(d)). The plaintiff may establish that he meets or equals a listed impairment, and that the impairment has lasted or is expected to last for at least twelve months or result in death. *See Listenbee v. Sec'y of Health & Human Servs.*, 846 F.2d 345, 350 (6th Cir. 1988). The plaintiff is not required to show the existence of a listed impairment in order to be found disabled, but such a showing results in an automatic finding of disability. *See Blankenship v. Bowen*, 874 F.2d 1116, 1122 (6th Cir. 1989).

Fourth, if the plaintiff's impairment does not prevent him from doing his past relevant work, he is not disabled. *Id.* The plaintiff has the burden of proving inability to perform past relevant work, or proving that a particular past job should not be considered relevant. *Smith v. Sec'y of Health & Human Servs.*, 893 F.2d 106, 109 (6th Cir. 1989). If the plaintiff fails to carry this burden, he must be denied disability benefits.

Once the plaintiff establishes a prima facie case that he is unable to perform his prior relevant employment, the burden shifts in step five to the Commissioner to show that the plaintiff can perform other substantial gainful employment, and that such employment exists in the national economy. *See, e.g., Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994). To rebut a prima facie case, the Commissioner must come forward with proof of the existence of other jobs a plaintiff can perform. *See Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 528 (6th Cir. 1981), *cert. denied*, 461 U.S. 957, 103 S.Ct. 2428, 77 L.Ed.2d 1315 (1983) (upholding the validity of the medical-vocational guidelines "grid" as a means for the Commissioner of carrying his burden under appropriate circumstances). It remains the plaintiff's burden to prove the extent of his functional limitations. *Her*, 203 F.3d at 391. Even if the plaintiff's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the plaintiff can perform, he is not disabled.[18] *Id. See also Tyra v. Sec'y of Health & Human Servs.*, 896 F.2d 1024, 1028-29 (6th Cir. 1990); *Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 88-89 (6th Cir. 1985); *Mowery v. Heckler*, 771 F.2d 966, 969-70 (6th Cir. 1985).

If the question of disability can be resolved at any point in the sequential evaluation process, the claim is not reviewed further. 20 C.F.R. § 404.1520(a)(4). *See also Higgs v. Bowen*,

---

[18]This latter factor is considered regardless of whether such work exists in the immediate area in which the plaintiff lives or whether a specific job vacancy exists or whether the plaintiff would be hired if he applied. *Ragan v. Finch*, 435 F.2d 239, 241 (6th Cir. 1970).

880 F.2d 860, 863 (6th Cir. 1988) (holding that resolution of plaintiff's claim at step two of the evaluative process is appropriate in some circumstances).

### B. The Five-Step Inquiry

In this case, the ALJ resolved the plaintiff's case at step five of the inquiry. At step one, the ALJ determined that the plaintiff had not engaged in substantial gainful activity. (Tr. 20.) At step two, the ALJ found that the plaintiff had severe impairments including arthritis of the right wrist and shoulder and hypertension. At step three, the ALJ found that despite these severe impairments, no impairment or combination of impairments met or was medically equal to a listed impairment. The ALJ stated that the plaintiff's subjective complaints were not persuasive. At step four, the ALJ found that the claimant had no past relevant work. At step five, the ALJ found that the plaintiff had the residual functional capacity ("RFC") to perform light work "with right upper extremity limitations to frequent," and that jobs that the plaintiff could perform existed in significant numbers in the regional economy. (Tr. 19-20.)

Case 3:03-cv-00742   Document 34   Filed 09/25/08   Page 31 of 55 PageID #: 54

**C. Plaintiff's Assertions of Error**

The plaintiff asserts many grounds for reversal.[19]  First, the plaintiff asserts that the ALJ erred in his evaluation of the medical evidence, specifically that provided by Drs. Attoussi, Davis, Dube, Hopp, and Sherrod.  Second, the plaintiff contends that the ALJ erred in finding that the plaintiff's dysthymic disorder, PTSD and obesity were not severe impairments, and he alleges that the ALJ violated the applicable regulations when he evaluated the plaintiff's alleged obesity.  Third, the plaintiff alleges that the ALJ erred in evaluating the plaintiff's credibility and assessing his subjective complaints, especially those of pain, and that the ALJ made erroneous statements about the plaintiff's pain medication.  Finally, the plaintiff alleges that the ALJ erred in characterizing the testimony of the VE.

**1. The ALJ's evaluation of the medical evidence, specifically that provided by Drs. Attoussi, Davis, Dube, Hopp, and Sherrod.**

The plaintiff raises several objections relating to the ALJ's analysis of and reliance upon the medical evidence concerning the nature and severity of his impairments.  Particularly, the plaintiff objects to the ALJ's characterization of the records submitted by Dr. Attoussi, as well as the ALJ's reliance upon the evidence submitted by Drs. Davis,

---

[19]Because the plaintiff and the defendant both formulate the arguments slightly differently, the Court has addressed the arguments in a slightly different order and manner than presented in the parties' memoranda.

Dube, and Hopp in reaching the conclusion that the plaintiff retained the ability to perform a limited range of light work. Docket Entry No. 19, at 28-30, 32-34. The plaintiff further avers that the ALJ erred in evaluating the psychological report provided by Dr. Sherrod.

### a. The Treating Source Rule

Although there are many standards to which the ALJ must adhere in assessing medical evidence supplied in support of a claim, generally speaking, greater deference is usually given to the opinions of treating physicians than to those of non-treating physicians. *See, e.g., Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007). This is commonly called the treating physician rule. *Id.* (citing other authority). Due to the nature of the treating physician relationship, these physicians are thought to supply "a detailed, longitudinal picture of [a plaintiff's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone." 20 C.F.R. § 416.927(d)(2). The opinion of the treating physician as to the nature and severity of the plaintiff's impairments will be accorded controlling weight so long as it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques," and "not inconsistent with other substantial evidence in [the] case record." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).

Although the ALJ is not always bound by the opinions and assessments of treating physicians, he must nonetheless consider and weigh them, and give reasons for rejecting them. *See generally Schaal v. Apfel*, 134 F.3d 496, 503 (2d Cir. 1998) (discussing the treating source rule). Social Security regulations and well-settled case law require the agency to "give good reasons" for disregarding the medical opinion of a treating physician. 20 C.F.R.§ 404.1527(d)(2); *Shelman v. Heckler*, 821 F.2d 316, 321 (6th Cir. 1987).

Here, Drs. Attoussi, Hopp, and Dube all saw the plaintiff on multiple occasions and/or on an extended basis and are treating physicians. (Tr. 127-34, 146-50, 174-88 (Attoussi); 394-99 (Hopp); 151-58 (Dube).) Dr. Davis conducted a consultative exam, while Dr. Bounds was a non-examining state agency consultant. (Tr. 159-65 (Davis), 362-69 (Bounds).) Dr. Sherrod performed a DDS psychological evaluation. (Tr. 166-70.)

**b. Dr. Attoussi**

In his March 13, 2003, decision, the ALJ noted that Dr. Attoussi restricted the plaintiff to a limited range of sedentary work.[20] (Tr. 19.) The ALJ ultimately concluded that the plaintiff retained an RFC for light work, with "right upper extremity limitations to frequent." (Tr. 19-20.) The ALJ explicitly found that "Dr. Attoussi's restriction . . . is too restrictive considering the limited nature of his treatment records." (Tr. 19.) The plaintiff objects to this characterization of Dr. Attoussi's treatment records.

The record reflects that Dr. Attoussi saw the plaintiff on November 28, December 14 and 26, 2001, January 16 and 20, February 20, and September 18, 2002. (Tr. 134, 129, 130, 147-50, 174-88.) He collected a medical history, ordered several tests, prescribed various medications, and diagnosed conditions such as degenerative arthritic changes and hypertension. (Tr. 134, 129.) He completed a Medical Source Statement on January 20, 2002, and he continued to treat the plaintiff through at least September 18, 2002. (Tr. 147-50, 174-88.) The objective evidence of record does not support the ALJ's assertion that Dr. Attoussi's treatment records were "limited."

---

[20]During the hearing, the VE testified that Dr. Attoussi's medical source statement described "basically sedentary work," but she qualified this assessment by describing a few light jobs that a hypothetical person with Dr. Attoussi's described limitations plus some others added by the ALJ (such as limited language skills) could nevertheless still perform. (Tr. 52.) Therefore, the ALJ may have mischaracterized Dr. Attoussi's opinion as being more limiting than it actually was. Accepting the VE's assessment of the limitations set forth by Dr. Attoussi, Dr. Attoussi actually described a person with an RFC similar to the one ultimately assigned by the ALJ.

While the ALJ is incorrect about the limited nature of Dr. Attoussi's treatment records, he is correct in pointing to other substantial evidence contained in the administrative record which supports his ultimate finding as to the plaintiff's RFC. A treating physician's opinion is not entitled to controlling weight when it is inconsistent with other substantial evidence in the case record. *Wilson*, 378 F.3d at 544. In viewing the ALJ's decision as a whole, the Court cannot find that the ALJ did not analyze the opinions proffered by Dr. Attoussi and the plaintiff's other physicians. The ALJ discussed those opinions as well as his reasons for assigning the various opinions the weight that he did in reaching his conclusion. Although it is tempting to say that the ALJ rejected Dr. Attoussi's opinion merely because he mischaracterized the nature of the treating relationship, this position fails to take into account the record, the decision as a whole, and the scope of this Court's review. Therefore, the Court cannot conclude that the ALJ's decision not to rely upon the opinion of Dr. Attoussi in ultimately assigning the plaintiff's RFC was unsupported by substantial evidence.

**c. Dr. Hopp**

According to the medical evidence of record, the plaintiff had a relatively short and limited treating relationship with Dr. Hopp. In May 1997, Dr. Hopp saw the plaintiff for a work-related contusion and sprained right wrist, noted the plaintiff's old war injuries but

found no impairment resulting from his then-recent work injury, and ordered limited use of the wrist for two weeks. (Tr. 398-99.) The plaintiff returned to Dr. Hopp in early June 1997, complaining of shoulder and wrist pain, and Dr. Hopp extended the plaintiff's restriction from work for an additional three weeks. (Tr. 396.) The plaintiff returned in late June, complaining that his wrist was worse. (Tr. 395.) Dr. Hopp noted that he suspected symptom magnification, and released the plaintiff. *Id.*

The plaintiff argues that Dr. Hopp's findings are inconsistent with an RFC of at least light work with a right upper extremity ("RUE") limitation. Docket Entry No. 19, at 33-34. Specifically, the plaintiff points to the limitation imposed by Dr. Hopp that limited lifting to under fifteen pounds with no reaching above the shoulder. Dr. Hopp imposed this limitation on June 10, 1997, for a three week period. (Tr. 387.) Upon the plaintiff's return to Dr. Hopp on June 26, 1997, Dr. Hopp released him to return to work with no indication of a permanent restriction. (Tr. 395.) When viewed in context, Dr. Hopp's findings indicate only that the plaintiff suffered a work-related injury but was later released to work with no permanent restrictions in mid-1997.

### d. Dr. Dube

Dr. Dube is an orthopedist, and he first examined the plaintiff on March 17, 2002. (Tr. 151.) Dr. Dube was assisted by a translator, and he took a very thorough history of the

plaintiff's past injuries and current limitations. Dr. Dube filled out a medical source statement dated the next day. (Tr. 155-58.) Essentially, Dr. Dube found that the plaintiff could frequently lift/carry up to twenty pounds, and that sitting, walking, and standing were not affected. Pushing and pulling were limited only in the right upper extremities.[21] (Tr. 155-56.) Dr. Dube indicated that the plaintiff had some postural limitations in all six categories (climbing, stooping, etc.). (Tr. 156.) However, at the plaintiff's second hearing, the VE testified that Dr. Dube's report would direct a finding of a limited range of light work, almost exactly the RFC ultimately assigned by the ALJ. (Tr. 51.)

### e. Dr. Davis

Dr. Davis conducted a consultative exam on June 10, 2002.[22] (Tr. 159-65.) Dr. Davis completed a medical source statement in which he limited the plaintiff to occasionally lifting up to twenty pounds and frequently lifting up to ten pounds. He limited standing and walking to up to two hours[23] of an eight hour day with less than one hour

---

[21]The findings and limitations contained in the medical source statement are set forth more fully *supra* at 13-14, and they are set forth accurately by the ALJ in his decision.

[22]A description of this exam and its findings are set forth *supra* at 14-16.

[23]Dr. Davis indicated in a typed report dated the same day as his medical source statement that the plaintiff could stand/walk up to six hours in an eight hour day with less than one hour uninterrupted. (Tr. 161.) However, in questioning the VE, the ALJ referred to and relied upon the medical source statement in which Dr. Davis indicated that the plaintiff could walk up to two hours in an eight hour day. (Tr. 51.)

uninterrupted, and sitting was unrestricted. (Tr. 161-62.) While Dr. Davis's evaluation was somewhat more limiting than Dr. Dube's, some portions of it are consistent with the description of a person who can perform light work. The VE assessed that this report, too, supported a "somewhat more narrow range" of light work. (Tr. 51.)

### f. Dr. Bounds

Dr. Bounds, a non-examining DDS consultant,[24] filled out an RFC Assessment form on October 20, 1997. (Tr. 369.) Dr. Bounds found that the plaintiff could lift/carry up to twenty pounds occasionally and up to ten pounds frequently. (Tr. 363.) He assessed that the plaintiff could stand and/or walk for about six hours in an eight hour workday, and sit for the same period. Pushing/pulling was unlimited. *Id.* In the space provided for an explanation, Dr. Bounds mentioned the plaintiff's history of gunshot wounds and cites to exams by Dr. Hopp and Dr. Campbell. (Tr. 363-64.) Dr. Bounds noted no postural limitations, limited gross manipulation/handling on the right side, and provided no other visual, communicative, or environmental limitations. (Tr. 364-66.) Finally, Dr. Bounds indicated that there was a treating/examining source statement in the file, and he indicated

---

[24]Dr. Bounds completed the assessment referenced by the ALJ as Exhibit 15E. The plaintiff indicated that Dr. Bounds's credentials are illegible, but in fact, a stamp on the signature page of his assessment reads "George W. Bounds, M.D." (Tr. 369) so the Court here refers to him as Dr. Bounds and assumes that he is a medical doctor.

39

his conclusions were not significantly different from those of the treating/examining source, presumably referring to the opinions of Drs. Hopp and Campbell.  (Tr. 368.)

The plaintiff argues that Dr. Bounds's opinion is deficient because his credentials are illegible, and because the plaintiff avers that Dr. Bounds did not review certain medical evidence in completing his assessment.  Pl.'s Br. at 33.  As noted above, Dr. Bounds is a medical doctor, as indicated on his assessment form.  *See supra* n. 23.  Additionally, the plaintiff criticizes Dr. Bounds for not relying upon, *inter alia*, records that did not exist at the time of Dr. Bounds's assessment in 1997.  While it is relevant to point out that Dr. Bounds's assessment was not the most current one contained in the administrative record, the argument that Dr. Bounds's opinion should be rejected because he did not consider records that came into being only after his 1997 examination is without merit.

### g.  Dr. Sherrod

The plaintiff alleges that the ALJ did not give sufficient weight to the opinions of Dr. Sherrod, a psychological examiner.  The ALJ explicitly discussed the report and conclusions of Dr. Sherrod in his decision, and he gave reasons for rejecting these opinions as required by the relevant standards.[25]  (Tr. 18-19.)

---

[25]Although the ALJ did not mention Dr. Sherrod by name, it is clearly Dr. Sherrod's report to which he was referring.  The ALJ noted that the psychological evaluation was performed by Lisa Patterson, a licensed psychological examiner who worked with Dr. Sherrod.  (Tr. 170.)

The ALJ evaluated Dr. Sherrod's opinions in light of the other psychological evaluations of record and taking into account the apparent quality of translation available to Dr. Sherrod and the other examiners at the time of the respective evaluations. The ALJ noted legitimate omissions, discrepancies, and contrary conclusions contained in Dr. Sherrod's report. (Tr. 18-19.) The ALJ also noted that Dr. Sherrod herself doubted her conclusions due to contrary test results and even suspected intentional error on the part of the plaintiff. *Id.* Therefore, it was reasonable for the ALJ to discount the assessment of Dr. Sherrod, and he did so in the manner required by the relevant statutory and case law.[26]

In sum, the ALJ followed the relevant requirements of the treating source rule in evaluating the medical evidence of record. When the ALJ did not credit a treating source, he gave good reasons for not doing so. Ultimately, the ALJ's decision to assign an RFC of a limited range of light work is supported by substantial evidence. As a result, the Court cannot conclude that the ALJ erred in assessing the medical evidence of record.

### 2. The ALJ's finding that the plaintiff's dysthymic disorder, PTSD, and obesity were not severe impairments.

The plaintiff argues that the ALJ erred in not finding that the plaintiff had the additional severe impairments of dysthymic disorder, PTSD, and obesity. Docket Entry No. 19, at 37. The plaintiff must put forth evidence that he suffers from a severe

---

[26]*See infra* at 43 for a more specific discussion of Dr. Sherrod's findings.

41

impairment(s) which limits his ability to do basic work activities, and the ALJ is required to consider the combined effects of impairments which may constitute a severe impairment in combination, even if they are not individually severe. 42 U.S.C. § 423(d)(2)(B).

### a. Mental disorders

The ALJ considered the plaintiff's alleged mental impairments at length, with details and analysis of the plaintiff's treatment history, psychological evaluations, and the opinions and records of his psychological examinations set forth in some detail. (Tr. 17-19.) The ALJ began by noting that the plaintiff has never undergone psychological treatment, despite his alleged history of depression.[27] (Tr. 17.) The ALJ was also cognizant of the fact that the quality of translation affected the usefulness of the information provided by the three psychological consultative examinations. *Id.* The ALJ considered the discrepancies between the plaintiff's daily activities and his complaints as reported in the psychological reports versus those reported in the various forms filled out by or on behalf of the plaintiff. (Tr. 19.) The plaintiff was less limited when self-reporting than as reported during the

---

[27]When collecting the plaintiff's history prior to an exam in March 2002, Dr. Scott Dube stated that the plaintiff was seeing a psychiatrist. (Tr. 151.) However, there are no records contained in the administrative record from a treating psychiatrist, and Dr. Dube's reference is the only known reference to mental health treatment in the entire record.

course of some of the psychological examinations.[28]  The differences support the ALJ's

decision not to fully credit some of the psychological evaluations.  A complete lack of

documentation of any psychological impairments or treatment supports the ALJ's finding

that the plaintiff does not have a severe mental impairment.

Dr. Doineau first examined the plaintiff on January 30, 1997, upon referral from

Tennessee Disability Determination Services.  (Tr. 376-79.)  A translator assisted in the

examination, and Dr. Doineau administered several diagnostic tests.  *Id.*  Significantly, the

plaintiff denied symptoms associated with PTSD, denied ever taking medication for mental

health issues or ever receiving psychiatric treatment.  (Tr. 377-78.)  Dr. Doineau described

the plaintiff as able to make decisions, manage his life, shop, cook, and care for his spouse,

who suffers from serious depression.  (Tr. 378.)  Dr. Doineau found the diagnostic test

results to be inconsistent, and she concluded that he was not mentally retarded, and that

there was no evidence of a psychotic condition or severe depression.  She assessed a mild

impairment in his ability to concentrate, and diagnosed late onset dysthymic disorder.

(Tr. 379.)  Dr. Doineau evaluated the plaintiff again on October 1, 1997, and upgraded the

---

[28]In July 2002, the plaintiff reported to Dr. Sherrod that he did not help with chores
and that his son had to help him with such basic functions as dressing and bathing.
(Tr. 167-68.)  However, at the hearing in November 2002, the plaintiff testified that he
helped his wife fix food, that their son helped them clean the house, and that the three of
them went grocery shopping.  (Tr. 44-45.)

43

plaintiff's impairment in concentrating and persisting to moderate, noting some symptoms of PTSD. (Tr. 389, 391.)

Dr. Kathryn Sherrod, a psychologist, performed a clinical interview and assessment on July 1, 2002. (Tr. 166-72.) Dr. Sherrod indicated that the plaintiff was anxious and depressed and had symptoms of PTSD. (Tr. 169.) She diagnosed chronic PTSD and late onset dysthemic disorder, among other conditions. (Tr. 170.) However, Dr. Sherrod's report is full of qualifiers: she suspected that a lack of education, unfamiliarity with tests, or committing errors intentionally may have contributed to his poor test scores. (Tr. 168.) She expressed skepticism about the plaintiff's apparent inability to do even simple tasks when he once functioned as a leader, and reiterated that perhaps the plaintiff was simply not trying. *Id.* Dr. Sherrod additionally opined that his limited activities of daily living and happiness with his life and family situation may be attributable to cultural reasons. *Id.*

The ALJ fully considered and discussed the mental health records provided by Drs. Doineau and Sherrod. (Tr. 17-19.) The ALJ noted that despite the limitations indicated in some of the psychological evaluations, when viewing the record in its entirety, the plaintiff's activities of daily living appear far less limited than indicated. (Tr. 19.) The ALJ reiterated that the plaintiff has had no treatment for any psychological impairment, nor had he taken any medication for any such impairment. The ALJ pointed out that some of the

44

plaintiff's alleged limitations may stem from his inability to communicate in English and cultural differences, rather than psychological limitations.[29] (Tr. 20.)

The ALJ's findings were proper. He relied upon the medical evidence of record, pointing out inconsistencies in the record and giving reasons for accepting or rejecting the findings of the plaintiff's psychological evaluators. The ALJ's conclusion that the plaintiff's alleged mental disorders did not rise to the level of a severe impairment is supported by the evidence of record.

### b. Obesity

The plaintiff also argues that his alleged obesity constitutes a severe impairment, and that the ALJ failed to follow the applicable Social Security regulations with respect to obesity. Docket Entry No. 19, at 38-39. The plaintiff points out that the ALJ "completely failed to even mention, much less consider, [the plaintiff's] obesity." *Id.* at 38.

As proof of his obesity, the plaintiff appears to rely upon the diagnosis of "Class 1 obesity," made by Dr. Davis, a consultative examiner. (Tr. 161.) However, this diagnosis was premised upon Dr. Davis's measurement of the plaintiff's height at 5'6½" and his weight at 188 pounds. (Tr. 160.) Because obesity is defined as a ratio of a person's height

---

[29]The plaintiff calls this conclusion "nonsensical, and supported by no evidence." Docket Entry No. 19, at 31. On the contrary, the concept of cultural influences on this plaintiff and his condition can hardly be discounted, and Dr. Sherrod offered this same opinion in discussing the results of her psychological evaluation. (Tr. 168.)

45

and weight, it is important that these measurements be accurate. Dr. Davis's height measurement was inconsistent with other height measurements in the record. Dr. Attoussi, a treating physician, recorded the plaintiff's height at 5'10" (Tr. 129) and 5'9" (Tr. 174), and Dr. Dube, another treating physician, recorded it at 5'9" (Tr. 152). Based on the similarity in measurements by Drs. Attoussi and Dube, Dr. Davis's measurement was likely inaccurate. Even at 5'6½", the plaintiff's body mass index ("BMI") would be 29.9, which is technically only "overweight," and does not quite reach the BMI cutoff of 30 that is necessary to be considered obese. *See* SSR 02-1p at *2.

There is no other evidence in the record indicating that any other doctors diagnosed or were even concerned about obesity, or any accompanying weight-related limitations. The ALJ did not improperly evaluate the plaintiff's obesity and its impact and potential functional limitations; instead, as a threshold matter, he simply failed to find that the plaintiff was obese, and this finding is supported by the medical evidence.

**3. The ALJ's assessment of the plaintiff's credibility and subjective complaints.**

In evaluating the plaintiff's subjective complaints, the ALJ determined that the plaintiff's testimony was not fully credible. (Tr. 20.) The ALJ stated that he followed the applicable regulations and rulings, and cited to the evidence contained in the record in support of his finding. The ALJ also considered the record as a whole, and he ultimately

determined that the plaintiff's limited activities of daily living could be explained not by an underlying disability, but by cultural differences and an inability to communicate in English. *Id.*

Both the Social Security Administration and the Sixth Circuit have enunciated guidelines for use in analyzing a plaintiff's subjective complaints of pain. *See* 20 C.F.R. § 404.1529; *Felisky v. Bowen*, 35 F.3d 1027, 1037 (6th Cir. 1994). While the inquiry into subjective complaints of pain must begin with the objective medical record, it does not end there. The Sixth Circuit in *Duncan v. Secretary of Health and Human Services*, 801 F.2d 847 (6th Cir. 1986), set forth the basic standard for evaluating such claims.[30] The *Duncan* test has two prongs. The first prong is whether there is objective medical evidence of an underlying medical condition. *Felisky*, 35 F.3d at 1039. The second prong is whether objective medical evidence confirms the severity of the alleged pain arising from the condition, or whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain. *Id.* This test does not require objective evidence of the pain itself. *Duncan*, 801 F.2d at 853 (quoting *Green v. Schweiker*, 749 F.2d 1066, 1071 (3rd Cir. 1984)).

---

[30]Although *Duncan* only applied to determinations made prior to 1987, the Sixth Circuit has since held that *Duncan* continues to apply to determinations made after 1987. *See Felisky*, 35 F.3d at 1039 n. 2.

47

The regulations promulgated by the SSA additionally provide that "we will not reject your statements about the intensity and persistence of your pain or other symptoms or about the effect your symptoms have on your ability to work solely because the available objective medical evidence does not substantiate your statements." 20 C.F.R. § 404.1529(c)(2). The SSA provides a list of factors to be considered in making these types of determinations. The Sixth Circuit in *Felisky* set forth these factors in detail, including: (a) daily activities, (b) location, duration, frequency and intensity of pain, (c) precipitating and aggravating factors, (d) type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms, (e) treatment, other than medication, received for relief of pain, and (f) any measures used to relieve pain. 35 F.3d at 1039-40. *See also Rogers*, 486 F.3d at 247.

The ALJ is charged with evaluating the credibility of the plaintiff at the hearing, and the ultimate decision as to credibility rests with the ALJ. The ALJ's credibility finding is entitled to deference "because of the ALJ's unique opportunity to observe the claimant and judge [his] subjective complaints." *See Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir. 2001) (internal citations omitted). However, "[i]f the ALJ rejects the claimant's complaints as incredible, he must clearly state his reasons for doing so." *Wines v. Comm'r of Soc. Sec.*, 268 F.Supp.2d 954, 958 (N.D. Ohio 2003) (citing *Felisky*, 35 F.3d at 1036). *See also Rogers*, 486 F.3d at 248. Social Security Ruling 96-7p emphasizes that credibility determinations must

48

find support in the record, and not be based upon the "intangible or intuitive notion[s]" of the ALJ. 1996 WL 374186 at *4. If a plaintiff's complaints with respect to symptoms are not supported by objective medical evidence, the ALJ must make a determination based on consideration of the record as a whole, including lab findings, the plaintiff's complaints, information provided by treating physicians and other relevant evidence. The ALJ must explain his credibility determination such that both the plaintiff and subsequent reviewers would know the weight given to the plaintiff's statements and the reasons for that weight. *Id.*

The ALJ's consideration of the plaintiff's subjective pain complaints and assessment of his credibility comport with the relevant requirements and are supported by substantial evidence. Although the ALJ did identify an underlying medical condition (arthritis), he also determined that the objective medical evidence did not appear to confirm the severity of the alleged pain, and that it was unclear whether the plaintiff's arthritis was of such a severity that it could be reasonably expected to produce disabling pain.

The ALJ first pointed to the objective medical evidence of record, which indicated that the plaintiff had taken no medication regularly for pain and had limited treatment for physical (and mental) impairments. (Tr. 20.) Although the plaintiff cites to two instances when the plaintiff received a prescription for Celebrex from Dr. Attoussi on January 16, 2002, and again on May 29, 2002, the ALJ considered the medical records provided by

49

Dr. Attoussi and assigned them little weight. Dr. Attoussi saw the plaintiff again on September 18, 2002, and the record of this visit does not contain any mention of Celebrex or any other pain medication so far as the Court can determine.[31] (Tr. 174.) The record of that visit appears to be the most recent medical information provided in the administrative record. If the plaintiff had been prescribed pain medication by another doctor prior to the hearing, there is no corroborating evidence in the record. Further, Dr. Attoussi completed a medical source statement that, while it does indicate some exertional and postural limitations, does not mention specific pain-related limitations outside of a possible avoidance of vibration and machinery, which might worsen the "perception of pain."[32] (Tr. 150.)

Other evidence in the administrative record fails to support the plaintiff's alleged level of pain. The ALJ pointed to an instance in which Dr. Hopp, a treating physician, suspected that the plaintiff was deliberately magnifying his pain symptoms. (Tr. 16.) Additionally, the ALJ discussed the inconsistencies among the various forms completed

─────────────────

[31]The records are hand-written and difficult to read. The plaintiff provided a transcription of these records and the plaintiff's interpretation confirms that there is no reference to Celebrex or any other pain medication in the notes of the September 2002 visit. (Docket Entry No. 19, Exhibit A at 30.)

[32]The plaintiff also attempts to rely upon a 1998 prescription for Motrin and a limited prescription for hydrocodone following oral surgery. These last two references are particularly unpersuasive.

50

by the plaintiff, reports of his pain as contained in documents completed by his examining and/or treating physicians, and his testimony at the administrative hearing. (Tr. 19.) Furthermore, in viewing the record as a whole, and taking into account a complete picture of the plaintiff, his history, background, and complaints, the ALJ pointed out that many of the plaintiff's limitations in the area of his activities of daily living are attributable not to any disability or disabling pain, but to his lack of ability to speak English and cultural differences. (Tr. 20.) Therefore, the plaintiff may go out less because he is unable to communicate with people outside of his very insular community (not because he is disabled), and he may do fewer household chores and tasks related to his own care because it is culturally less acceptable for a Kurdish man to perform this type of work.[33]

In sum, the ALJ undertook a review of both the plaintiff's complaints of pain and his credibility, citing specific instances in the record that both fail to support his complaints and undermine his credibility. Credibility determinations regarding subjective complaints rest with the ALJ so long as they are reasonable and supported by substantial evidence. The decision in this case contains specific reasons for the ALJ's credibility finding which are supported by the evidence of record. The ALJ did not err in evaluating the plaintiff's credibility or his subjective complaints.

---

[33]During the psychological evaluation by Dr. Sherrod, the interpreter communicated that "it would be considered an insult to [the plaintiff] to expect him to do housework" according to Kurdish customs and culture. (Tr. 167-68.)

51

### 4. The ALJ's characterization of the VE's testimony.

The ALJ found that the plaintiff could perform at least light work with "right upper extremity limitations to frequent." (Tr. 19.) Based upon this RFC finding, the ALJ questioned the vocational expert as to whether an individual with this RFC of the plaintiff's age, education and lack of past relevant work could perform jobs existing in the relevant occupational base. *Id.* The VE identified several representative jobs that the ALJ found constituted a substantial number. (Tr. 20.) The plaintiff filed a post-hearing brief disputing whether or not jobs actually existed in substantial numbers, and reasserted this belief in his brief in support of his motion for judgment on the record. Docket Entry No. 19, at 46. The ALJ addressed the plaintiff's claim and post-hearing brief in his decision, decided that jobs did exist in substantial numbers, and explained that the jobs listed by the VE were "merely representative of jobs that an individual like the claimant could be expected to perform." (Tr. 20.)

In response to a few hypothetical questions, the VE did opine that the plaintiff would be unable to perform any work. (Tr. 56, 58.) However, the ALJ must rely upon a VE's answer to a hypothetical question only if substantial evidence supports the assumptions included in the hypothetical question. *See Felisky,* 35 F.3d at 1036; *Hardaway v. Sec'y of Health and Human Servs.*, 823 F.2d 922, 927-28 (6th Cir. 1987); *Varley v. Sec'y of Health and Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987). Additionally, a hypothetical

52

question need not take into account a plaintiff's subjective complaints if the ALJ finds that those complaints are not credible. *See, e.g., Cline v. Shalala*, 96 F.3d 146, 150 (6th Cir. 1996). Further, when substantial evidence supports an ALJ's finding that a plaintiff has the RFC to perform a significant number of jobs identified by a VE, it does not matter that the VE also testified that the plaintiff could not perform other jobs based upon a hypothetical question that assumed a more severely restricted RFC. *Maziarz v. Sec'y of Health and Human Servs.*, 837 F.2d 240, 246-47 (6th Cir. 1987).

In this case, the ALJ asked the VE a series of very detailed hypothetical questions, asking the VE to assume various scenarios based upon the different limitations contained in the medical evidence of record and suggested by the record as a whole. (Tr. 49-58.) In two instances, the VE opined that all work would be precluded, and the plaintiff relies upon these instances to argue that the ALJ either should not have relied upon the VE's testimony, or alternatively, that the VE's testimony actually supports a finding of disability. Docket Entry No. 19, at 46.

The two times the VE concluded that all work would be precluded were (1) when the VE was asked to consider Dr. Sherrod's evaluation at Exhibit 14F (Tr. 166-72) and (2) when the VE was asked to assume that the person experienced pain at a level that caused an inability to sustain work-like functions, or experienced pain at the moderate severe level for a sufficient period of time to cause such an inability. (Tr. 55-56, 58.) The

53

ALJ was correct not to rely upon these answers in determining whether or not the plaintiff could perform jobs despite his impairments, and these answers do not support a finding of disability as urged by the plaintiff. In her July 1, 2002, evaluation, Dr. Sherrod herself cautioned against strict reliance on her test results, speculating various reasons for the plaintiff's seemingly poor performance, including intentional errors. (Tr. 168-69.) In considering the second hypothetical that would preclude all work, the VE was asked to assume a person who experienced a moderate/severe level of pain over a prolonged period of time. The ALJ considered the plaintiff's complaints of pain and did not find him entirely credible. Therefore, the ALJ was justified in not relying upon the VE's answer to this question.

In sum, the ALJ concluded that despite the plaintiff's limitations, there were still jobs that exist in substantial numbers that he is able to perform. In reaching this conclusion, the ALJ properly considered the testimony offered by the VE. Substantial evidence supports his finding.

## RECOMMENDATION

For the above stated reasons, it is recommended that the plaintiff's motion for judgment on the record (Docket Entry No. 16) be DENIED.

Any objections to this Report and Recommendation must be filed with the Clerk of Court within ten (10) days of service of this notice, and must state with particularity the specific portions of this Report and Recommendation to which the objection is made. Failure to file written objections within the specified time can be deemed a waiver of the right to appeal the District Court's order. *See Thomas v. Arn*, 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed. 2d 435 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully Submitted,

JULIET GRIFFIN
United States Magistrate Judge

Case 3:03-cv-00742   Document 34   Filed 09/25/08   Page 55 of 55 PageID #: 78